Good morning, Your Honors. May it please the Court, my name is Jamie Olander. I'm here on behalf of Pauline Caldwell. I'd like to reserve six minutes please. This is a case in which we allege that Pauline was subjected to discrimination in the form of hostile work environment and also denied promotion. Unfortunately the trial court determined that the case should not go to the The trial court relied on what we believe to be, shall we say, an older standard for determining whether discrimination occurred, specifically whether Pauline was able to establish that the State's reasons for not promoting her or for demoting her were pretextual. In addition, the trial court determined that Pauline could not establish a hostile work environment because she failed to show that the comments directed against her were constituted racial slurs, shall we say. I'd like to address that point first of all. There's nothing in Title VII, Your Honors, that requires a plaintiff to establish in a race discrimination case that he or she was It's a race-based hostile work environment, isn't it? That's what she has to establish. Yes. So if none of the evidence supports that there's anything racial that's been directed at her other than, as I understand it, a hearsay allegation that this supervisor expressed discomfort at African-Americans in a personal context having to do with a doctor treating their son, how does that carry the burden that you have to establish that whatever was going on in the workplace was racial as opposed to a very antagonistic supervisor-subordinate relationship? Yes, Your Honor. Thank you. We do say, you know, isolated remarks. Even the Supreme Court says isolated remarks don't constitute sufficient evidence. So what is there here? Thank you. First of all, we're not talking about isolated remarks. We're talking about a daily campaign of racial nature, of racial nature. Yes, but Your Honor, what we're not, we're talking about here is an employer may not use certain words. It's not a statute that bars certain language. It's a statute that bars certain types of conduct, which may include statements such as calling someone a racially charged epithet or something like that. But there are other forms of discrimination. And just because somebody doesn't use a racial epithet does not mean that they do not have racial animus. When you are the only employee in an office, in a protected class, and the supervisor treats you demonstrably in a different way than any other employee, repeatedly takes you and you alone to her supervisor's office, and you're very agitated. And when that other employee also sees the manner, maybe not the specific language, Your Honors, but the manner in which that supervisor treats you, and when that other employee, and I'm speaking specifically of Diane Jewell here, when that employee says that she could not believe the tone or the manner in which the protected individual was being harassed by the supervisor, that you would not treat a dog in that way. Excuse me. This is specifically what Title VII was enacted to prevent, notwithstanding the fact that the supervisor may not be using a prohibited slur. I mean, we live in a day and age now in which I think most of the... Well, I think we understand what Title VII is about. You may want to concentrate on the record. I thought Judge Akuda had a question. She was trying. Judge Akuda was trying to ask you a question. I'm sorry, Your Honor? Judge Akuda was trying to ask you a question. Judge Akuda. Okay. Didn't the employer come forth with various legitimate reasons as to why this employee was treated differently? In other words, she was in a different class than the others? She had a higher-ranked position, and also there were some significant problems with her work product? Yes. The employer in this case tried to draw a distinction between one class of employee that had slightly different responsibilities. So on the one hand, you have a financial analyst who has certain duties. On the other hand, you have a fiscal technician who has, I suppose, lesser duties, lesser training. But in this context, I don't think that this makes a huge difference here. You're talking about a half-dozen people in an office, and the fact that one has slightly different duties does not mean that that person should be treated in an entirely different way, in a disrespectful and demeaning way. The other question I think you raise is the employer points out that there may have been legitimate reasons to discipline Pauline Caldwell. But that is not to say that you're suddenly entitled to treat her in a demeaning and abusive way. Let's not forget, Your Honors, Pauline felt so impacted, so affected by this treatment that she went to the emergency room and was prescribed 30 days' leave from work by a physician, partly because of an assault by a client, but also partly because this pattern of conduct had been going on for quite a while. And, I mean, so you can't really say that the employer pointed out some kind of legitimate basis based on, yes, Pauline made a few mistakes, everyone makes mistakes. That is not to say that you should be able to then abuse that employee. Does that answer your question? There needs to be some evidence that the abuse, discrimination, harassment was on account of race. And as Judge Fischer said, there was only this one stray remark. I think there was one other piece of evidence in the record that an employee had said to another employee about a photograph. But Title VII, of course, isn't an etiquette statute. And, Your Honor, again, the evidence that was adduced is that this was a continuing, a daily pattern of harassment. There's one incident that you bring up. I believe it was the May 21st on the desk, and apparently she was not supposed to do that. Or maybe it was the supervisor, Sheila Tomeyer, sending her an email, and she didn't respond quickly enough. Well, there was no office policy about responding to emails. But Pauline, the sole African American, was the only person who was ever brought to task for this. And so there's, as the State claims, there's one instance where they say that... Maybe there's no specific policy in writing, but normally, if an employee gets something from a supervisor, wouldn't it be expected they would respond? I suppose. I suppose. But I guess, let's say that somebody makes a mistake at work. Does that... Whether they really did or not, if their supervisor sends them an email that raises some question, doesn't an employee normally have to give a timely response to their supervisor? Well, I believe that, and I'm not sure, so I don't want to say something that's not in the record. But Pauline's concern was that there was no standard for the white employees, the Caucasian employees, to respond to Tomeyer's emails. And there was no retribution or consequence if they didn't respond immediately to those emails. But to get back to the point that we were talking about, so the State says that Tomeyer became upset with Pauline because of... On one or two occasions. And that justified this course of conduct. But you have to look at this in a light most favorable to Caldwell here. And this is... You're talking about isolated events and the excuse that has been brought up to justify somebody losing their temperature once. And what we're talking about is a continuing pattern of abuse directed only at Pauline Caldwell. So you're... Counsel, you said initially you wanted to save six minutes for rebuttal. Oh. We're down to four and a half minutes now. Okay. I'm sorry. I thought that the... I didn't realize it was counting down my entire 15 minutes. So with that, I will take my leave. Thank you. You may please the Court. I am Marie Clark, Assistant Attorney General, appearing on behalf of the State Defendants. I'm sharing time with Mr. Younglove, who's representing the union. I will take nine minutes of our 15 minutes. Let me ask you a question at the outset that's on my mind. Okay. Because you probably know the answer. I've seen some academic literature that raises questions whether in a hostile environment claim, if it's sex discrimination, do the comments have to be about sex? Or if it's racial discrimination, do they have to be about race? And for example, if someone has, as counsel's arguing, like an anti-racial animus, but they display it not by making a racial comment, but by just saying things like, you're so stupid or you're so slow, you know, or very critical language, but not racial, can that constitute a, like a hostile environment? And like my understanding is there may be some difference in the circuits. I wondered if you can tell me if the Ninth Circuit, if our circuit has established the law on that for us. Well, Your Honor, I believe that that is a good question. And I think that the best way to answer that is that I don't know that there has to be racial slurs directed at the particular employee, but nevertheless, the conduct must be established to be race-based harassment, meaning that the harassment was on account of that person's race or other protected status. And in this case, we believe the district court correctly ruled that not only had Ms. Caldwell failed to establish that element of her prima facie case, the failure of any race-based harassment, but that, secondly, that she failed to meet the other important element of the test, and that is establishing that the alleged harassment or complaint about conduct was severe and pervasive. If you look at the record in this case, in fact, not just limited to Ms. Caldwell's declaration, but the documentary evidence, including her objection to her supervisor's performance evaluation, the letter to Mr. Ramsdell, when you go through that record, there are really only four actual verbal confrontations specifically referenced by Ms. Caldwell in which she complains about her supervisor's conduct over a six-month period. And importantly, the supervisor's conduct was work-related, first precipitated by her failure to meet the performance problems on Ms. Caldwell's part, but then those performance problems evolved into problems of insubordination. It's undisputed in the record that, in fact, there was no racial or not even any derogatory terms directed at Ms. Caldwell by the supervisor in question. But to just to sharpen the point, I think Judge Gould is asking, and I have the same question, is if the employee who is being subjected to this supervisorial action is the only black in a working unit, is the only one singled out for close watch and loaded term, does the claim fail because it is not linked to some verbalization of what the conduct might inferentially support as race-based supervisorial selection out and, therefore, harassment? Well, certainly the cases on point that have found that there's been severe and pervasive harassment, that is race-based, generally do have at the core racial slurs, comments directed at the employee. I don't know that that's necessarily required. But in this case, there was no evidence that Ms. Caldwell was singled out for different treatment or illegitimate reasons because on account of her race. The issues were that she had performance issues. And all the evidence is that the complaint about conduct related specifically to Ms. Caldwell's performance. So, and, again, it goes to the severity or the pervasiveness of the issue as to the fact that there were no, there was no racially or derogatory language that was used to describe the language directed at Ms. Caldwell or in her presence. Now, certainly, she may have felt Well, if there's some doubt, for example, if a supervisor is careful enough to guard his or her comments, but is nonetheless really, there is internalized racial bigotry at work, but is smart enough to keep that out of verbalizations, but then that is the same supervisor makes a racially derogatory comment totally in a different context, wouldn't that be relevant evidence as to what's really underlying the allegedly performance related actions? Well, I think if we look at the example here with regard to Ms. Caldwell I understand. Just as a generalization, is it fair to look outside the interpersonal relationship between the employee and the supervisor and find external evidence, that circumstantial evidence, that this person may indeed have, for purposes of summary judgment, may indeed have a racially motivated intent here? I think that there still has to be evidence that the supervisor acted on that racial animus. And in this case, we know from the supervisor's workplace decisions Okay, but I just want to make sure I understand. Your answer is yes, you could look to it, but you still have to then show that that was translated into what was going on objectively in the conduct. And if there are other reasons to explain the conduct, then we're back in that wane. Correct, Your Honor. And then specifically looking at the specific alleged remark made and attributed to Ms. Tomeyer, the supervisor in this case, we believe it doesn't change the outcome under this court's precedence, first because, in fact, the statement is ambiguous. And, Your Honor, I may want to make sure I'm not going over my allotted nine-minute time. Well, you're down to seven minutes and 40 seconds and counting. We had seven and a half minutes for each of you in the union, counsel. Finish what you're saying. Well, first of all, I think it's important to note that the comment attributed to Ms. Tomeyer was ambiguous. And you have to rely on Ms. Jewell's interpretation, and she gives two different accounts as to what was said and when. It's not about the workplace. It's not about Ms. Caldwell. And when you look at the supervisor's actual conduct in the workplace, she provided Ms. Caldwell with training that she needed continuity in that program. And she also advanced the recommendation to hire an African-American candidate for the permanent position. And it's really undisputed that this supervisor had a very blunt, direct management style, and she used that style with Caucasian employees as well. In fact, there's evidence that   individuals who had higher-level duties, as did Ms. Caldwell. So in our view that and in the district court's view, this stray, isolated, ambiguous remark was certainly insufficient than to overcome the State's race-neutral reasons for first addressing Ms. Caldwell's performance problems, and then for hiring the better-qualified candidates. And we've cited this Court's precedent, including Nesbitt v. PepsiCo. It's also analogous to the situation in Nidds v. Schindler Elevator Court, found at 113 F. 3rd. You don't need to cite it. We have the cases from them. Okay. And, Your Honor, I see that my time is up. Yes. Thank you. All right. Thank you. Good morning, Pleasers Court. My name is Ed Younglove. I'm the attorney for the I'd like to go right to four facts that I think are critical to the union's position in this case with regard to Ms. Caldwell's claim that the union engaged in discrimination against her and failed its duty of fair representation to her by not filing a grievance in July of 2003. And those facts are that the grievance procedure in the contract had a 14-day time limitation on the timeliness of grievances. They had to be filed within 14 days. The contract procedure, unlike a lot of union contracts, allows the employee to individually file a grievance as well as the union. So the union didn't really own the grievance. The employee had a right to file a grievance on their own and also to pursue grievances through the grievance procedure to the Civil Service Board without the union. The contract didn't make the union an interested party because obviously it was their contract, but the employee had a right to pursue that remedy on their own. Thirdly, the request for a grievance that Ms. Caldwell relies on is her July 5, 2003 letter, which referred to events, all of which occurred well outside the 14 days prior to her delivering it to Mr. Ramsdale on July 5. The last incident in there referred to is May 22, 2003. And in fact, she went on leave from work on June 3 of 2003. So she hadn't even been at work for more than 30 days prior to this case. There is not one reference in the record to race, to racial discrimination. She does talk about the hostility of the workplace. Ms. Caldwell is obviously an African-American. And she does pose the rhetorical question at the end, you know, so what makes me so unfit? And I probably suggest that race may be an issue in that case, but the letter doesn't say anything about racial discrimination. Finally, on every other occasion Ms. Caldwell requested her union to assist her, including one occasion involving a race-based incident involving a photograph, offensive photograph of the Reverend Jesse Jackson. The union provided her with representation on every single occasion through at least four different shop stewards, one of whom was also an African-American. Finally, in this case, there's no comparisons. In other words, Ms. Caldwell did not provide the court with any evidence of comparison cases where, for example, the union filed an untimely grievance for a Caucasian employee or had similarly refused to file grievances for African-American employees or provided or failed to provide them with representation. Ms. Caldwell relies on the Goodman case and the Woods case, which are addressed in our briefs. There is the Beck decision from this court that came out after the briefing in this case. An excellent opinion by Judge Ikuta. They're all good. They are. I mean, everything she writes is a joke. But a different set of facts. I'm going to assign her all of the writing responsibility now. But a different set of facts than the facts in this case. I mean, there the court found that the union had both breached its duty of fair representation and was guilty of race discrimination based on the facts in that case, which were that the union arbitrarily failed its ministerial duty of filing a grievance when requested by the employee within a timely time fashion. And they could have, but inexplicably failed to do so. And also found discrimination because the employee had provided evidence of discrimination. And in that case, the discrimination was gender discrimination. And the employee showed that the union had aggressively pursued grievances on behalf of male employees, male members, in similar situations. And also on another occasion, failed to aggressively pursue a grievance for another female employee. And the court found that that was sufficient evidence to have none of those facts in this case. In this case, we have the union's alleged failure to file a grievance, which would have been untimely even if it had filed it, which didn't even refer to race issues in the workplace situation that Ms. Caldwell was faced with. And we also have a union that not only assisted her, but there's no evidence that the union failed to demonstrate any kind of pattern of failing to support or represent African-American employees versus its position with regard to Caucasian employees. So I think the facts in this case are considerably different than those in the Beck case. This record seemed troubled by Mr. Ramsdale's inadequate understanding of the issues relating to this kind of a claim. Has the union got some education program to bring its shop stewards into modern times? Your Honor, I mean, if Mr. Ramsdale's testimony, which certainly is not the most articulate testimony with regard to the union's preparation of its stewards with regard to these issues, I also don't believe that it's accurate had this case gone forward and a complete record been compiled with regard to the training that the union has and the material that the union presents to its stewards on these issues. So – but I will admit, and the Court was concerned by the fact that Mr. Ramsdale demonstrated a lack of knowledge of both the duty of fair representation and discrimination claims. I can – I just simply can own up to that, but I don't believe it's actually reflective of the union's position with regard to these matters. Well, I'm glad to hear that. I see my time is up, and thank you very much. Thank you. Very briefly, Your Honors, I'm glad that you raised that point about, you know, whether a shop steward should be, you know, trained or should they have any knowledge. It's very clear from the testimony of Ramsdale that he had no knowledge about race discrimination. There's very little training. And there's a recent case here called Noyes v. Kelly Services, which you may be familiar with. And in that case, Judge Kudo wrote that – pardon me – you don't necessarily have to show arbitrary and capricious behavior by the union. You may also establish a breach of duty through showing of bad faith. That's plain from the show. Substantial evidence of fraud, deceitful action, or dishonest conduct. And I would only point out in this case that, you know, obviously Pauline's case against the union could be much stronger. It's clear that she didn't know what her rights were. She would have pursued them more quickly. But in the record, it is established that she did contact Mr. Ramsdale within the time period in which to file a grievance. And he mentioned nothing about having to worry about 14 days. And, in fact, at his deposition, he denied that Pauline had ever delivered this letter to him, even though, you know, we have a corroborating witness, the woman who gave Pauline a ride to go meet Ramsdale. Ramsdale denied that he got the letter. He advised Pauline to wait even longer before filing any kind of grievance. And so if you go back and you look at Ramsdale's testimony, it seems very clear to me that, even though there was only a small window in which to make a timely grievance, that he certainly was no help whatsoever there. And that, at the very least, it seems that there may be a triable issue of fact there. Very briefly, I want to talk about pretext for just a minute. The time always goes so fast in this context. But it seems to me that the trial judge in this case, clearly he found that, at a bare minimum, Pauline had made a case under McDonnell Douglas, but found that she did not adduce sufficient evidence pretext to overcome the State's legitimate reasons. And I would just ask you to go back, take another look at the State's so-called legitimate reasons. They hire a gentleman who's immediately going to be shipped out to Iraq. Did they know that at the time that they hired him? Was it that they knew he was absolutely going, or was it a possibility? He notified them immediately that he was being shipped out. No, but I mean when they hired him, did they not select him for the position before he got his notice? I'm not exactly clear on the timing of that. Isn't that critical? I mean you wouldn't want to be arguing, I take it, that they should not offer a position to someone who is subject to call-up to Iraq? Well, I'm not exactly clear on the timing of when they found out. But I do believe, Your Honor, that in the record you'll find that there's no dispute that before the date he was to have started, he notified them. That's different. Once they've made their hiring decision and extended an offer to him, they're obviously in a bind if they terminated or breached their agreement based on a military call. At least that's what they perceived. So I think Judge Fischer's asking you an important question. Is there evidence in the record that they knew he couldn't serve when they made the hire decision? And for you to say that you're not clear on it is not helpful. Anyone can forget stuff in the record, but if you know what's in the record you should let us know. And I don't want to misquote the record. I'm basically out of time. May I answer? Oh, absolutely. Okay. What's really important to me is not so much the... Answer the question. Yes. I don't know specifically... So that's the answer. You don't know specifically when he was hired in relation to when he knew he was going to be called to Iraq. I specifically don't know when the defendant, State of Washington, learned for the first time. I don't know if that specific question is answered in the record, Your Honor. All right. Thank you. You've answered the question. Thank you. Thank you. All right. The case argued is submitted and we'll be taking a short recess. Meanwhile, if the students from Washington are here, we'll be resuming our calendar after our break. All rise. This court is now recessed.
judges: Fisher, Gould, Ikuta